[No. A049088. First Dist., Div. Three. Apr. 30, 1992.]

WILLIAM R. ALLING et al., Plaintiffs and Appellants, v. UNIVERSAL MANUFACTURING CORPORATION et al., Defendants and Appellants.

LMP CORPORATION et al., Plaintiffs and Appellants, v. UNIVERSAL MANUFACTURING CORPORATION et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part V.

## COUNSEL

Khourie, Crew & Jaeger, Eugene Crew, Richard L. Grossman, Paul F. Kirsch and Lawrence J. Sullivan for Plaintiffs and Appellants.

Pillsbury, Madison & Sutro, Philip L. Judson, C. Douglas Floyd, Ashen, Martin, Seldon, Lippman & Scillieri, John A. Scillieri, Hufstedler, Kaus & Ettinger, Shirley H. Hufstedler, Seth M. Hufstedler, Jerome H. Craig and Thomas J. Ready for Defendants and Appellants.

## OPINION

**MERRILL, J.**—Universal Manufacturing Corporation (Universal) and its corporate successor, MagneTek, Inc., appeal from a judgment totalling $25.771 million entered following a jury verdict finding them liable to plaintiffs LMP Corporation (LMP), Stevens Luminoptics Partnership (SLP) and Calmont Technologies, Inc. (Calmont) for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, and interference with advantageous business relations. Because the trial court prejudicially erred in admitting certain critical evidence, we reverse the judgment entered in favor of LMP, SLP and Calmont and against Universal.

LMP, SLP and Calmont and William Alling (Alling) cross-appeal from an adverse judgment on their claims against Universal under the Cartright Act; and Alling appeals from a judgment in favor of Universal on his claim of wrongful termination of employment. In the unpublished part of this opinion we affirm this portion of the judgment entered in favor of Universal and against LMP, SLP, Calmont and Alling.

# I

## Factual Background

This litigation had its origin in the invention and development of an electronic ballast for fluorescent lighting systems.[1] The ballast was named "luminoptics" by its inventor, Carlisle R. Stevens. In 1977, Stevens and Alling formed a limited partnership, SLP, to develop the ballast. SLP in turn gave an exclusive license to the Luminoptics Corporation (Luminoptics) to exploit SLP's patents and technologies for the production, manufacture and marketing of the product. Alling was the president and principal shareholder of Luminoptics.

Despite some success with early electronic ballast prototypes, Luminoptics was unable to produce a marketable electronic ballast on its own. Luminoptics therefore entered into an agreement with TRW, Inc., a large aerospace and electronics company. TRW was to engineer marketable electronic ballasts using Luminoptics' prototypes and begin the mass production of commercial products on Luminoptics' behalf, using TRW's manufacturing facilities in Taiwan. After 18 months of intensive effort on the part of both TRW and Luminoptics, the effort failed to produce any reliable preproduction commercial prototypes. Under a settlement with TRW, Luminoptics had to buy back the remaining inventory and materials, including unfinished parts and some 500 defective units.

After the unsuccessful venture with TRW, Alling found another manufacturer, Eastern Electronics Co., Ltd. (Eastern), an independent contractor located in Taiwan. Alling had Luminoptics ship the unfinished or defective materials produced by TRW to Eastern with the expectation that these would be "finished" or corrected, and form the basis for the production of new units. This arrangement was no more successful than the previous one with TRW. Eastern was unable to manufacture the electronic ballasts according to the specifications given to it by Alling and Luminoptics, beyond a very few units which were plagued with defects.

Alling attributed the problems which Luminoptics was having in developing and marketing an electronic ballast to a lack of investment capital, and to

---

[1] A ballast is a component of fluorescent lighting systems in the nature of a transformer, which ignites the lamp and controls the flow of electronic current. The ballast at issue here, as developed by Carlisle R. Stevens, marketed by Luminoptics Corporation, and bought by Universal, was entirely electronic or "solid state." Conventional ballasts, such as those in use since the 1940's, have consisted of an iron core wrapped with copper or aluminum wire. Universal was one of the two or three leading manufacturers and marketers of conventional ballasts.

opposition from the existing conventional ballast industry, including Universal. He devoted his efforts to trying to create a market for the electronic ballast, and to wooing potential investors who could make available the large amounts of funding that he felt would be required to make the product a success. In late 1980 and early 1981, Alling developed a "Proprietary Business Plan," (business plan) or prospectus, which he distributed to many persons, companies and potential investors in an attempt to obtain some financing for Luminoptics. Alling described this plan or prospectus as a "five-year plan" for "long range growth."

The business plan began with express disclaimers of liability for the projections made therein, stating that "in view of its short operating history and the uncertainty of relevant competitive and other economic circumstances, . . . these plans and projections . . . cannot be considered reliable beyond a short time. Moreover, in enumerating certain of the assumptions upon which financial projections have been based, the company makes no representations that all such assumptions have been so enumerated." Having made these sweeping disclaimers, the business plan proceeded to make a set of extraordinarily optimistic statements and "projections" concerning the future development of Luminoptics, to the effect that over a five-year period the business would grow exponentially from producing 120,000 commercial units in 1981 to 2 million units in 1985, with a projected growth in net company profits after taxes from $634,500 in 1981 to $6.325 million in 1985. These projections expressly assumed that millions of dollars in capital investment would be available every year; that energy costs would rise dramatically at a rate of 20 percent per year; and that "[p]roduct demand will exist and the annual sales, indicated in the [business plan], will be achieved."[2]

---

[2]Among other things, the business plan contained a list of some 19 "Current Products" together with a price schedule; a list of "Customers," including agencies of the United States and Canadian governments, General Electric Co., CitiCorp/CitiBank, the International Monetary Fund, and Universal, each with "Actual/Anticipated" orders "for quotations and demonstration units"; and itemizations of up to $22.4 million worth of substantial orders "currently in quotation and negotiation process," with various large corporations and government agencies. The business plan projected radically increasing energy costs at rates of up to 20 percent per year; represented that Eastern "currently has the capacity of producing 40,000 ballasts per month and is prepared to quadruple this capacity over the next five years"; stated that it would be producing 217,000 commercial units in 1981, and that delivery of these commercial units had already begun; represented that Luminoptics would be producing electronic ballasts through independent contractors in Italy, Haiti, and elsewhere, for worldwide distribution; represented that Luminoptics would be selling 120,000 ballasts "within the next year" from its Eastern manufacturer, and that the "Italian government is projecting production of 50,000 ballasts in the coming year and increasing to 1,200,000 by 1985"; and forecast huge increases in demand for its "top of the line" products, with up to 2 million units sold in the fifth year of operation alone. Over a five-year period, the business plan projected

Alling distributed his business plan widely to venture capitalists, investment bankers, securities companies, and electronics firms, including Universal. Despite the failure of Luminoptics or any of the independent manufacturers with which it contracted to produce a commercially marketable product, Alling regularly represented to potential investors that Luminoptics's products had been "proven in commercial use," and that it had many large and substantial customers for these products, with a backlog of orders worth millions of dollars. However, these representations, as well as the projections contained in the business plan, were grossly inflated. In reality, Luminoptics had no products readily available for commercial use, no proven market, no existing commercial customers, and no reliable facilities for commercial production.

None of the companies or individuals to whom Alling distributed the business plan expressed any interest in investing capital in Luminoptics. Alling had several contacts with officials at Universal from the late 1970's. Although Universal was not at that time interested in buying any equity in Luminoptics, Alling's attempts at interesting Universal in the electronic ballast did result in a request by Universal to purchase some samples from Luminoptics for testing.

By letter dated May 14, 1980, Alling told Universal that Luminoptics "would be happy" to sell it electronic ballasts "at the appropriate time," but that "[f]or the present, production is pretty much spoken for . . . ." After promising to "get back" to Universal when it had some ballasts to sell, Alling insinuated that Universal's failure to become "the leader in this new technology" could only be explained by the inference that it was conspiring to stifle innovation in the field in order to preserve its own existing dominant market position. The letter closed by suggesting that Universal could "prevent that type of accusation by getting involved with the electronic ballast [i.e., Luminoptics] in a meaningful way."[3]

---

gross profits growing from $5.32 million in 1981 to $35.65 million in 1985 and net profits increasing from $1.269 million to $12.65 million in an exponentially expanding business, on the basis of assumed investments of over $47 million in operating expenses, plus direct production costs of almost $124 million.

[3]The letter, which was addressed to Mike Stein at Universal, stated: "In reference to our phone conversation of yesterday I am enclosing a data package on our electronic ballasts for your consideration and review. I trust this information is sufficient for your needs.

"We would be happy to sell you ballasts at the appropriate time. For the present, production is pretty much spoken for as we are doing a number a [sic] test installations around the country. Beginning next January we hope to have a UL approved unit on the market for architectural dimming systems. I will get back to you at the appropriate time.

"Our old offers still stand. Anytime Universal wants to get into the electronic ballast business we are prepared to help. Universal still represents the best chance to get the electronic ballast into significant production and get the device out into the market doing it's

Paul Einhorn, then chairman of Universal, responded to Alling's letter on June 30, 1980, confirming Universal's interest in the electronic ballast, but stating that what Alling was proposing was neither economically nor practically feasible at that time, due to difficulties with the product itself and the amount of financing that would be required to make it commercially viable. The letter also took "sharp issue" with Alling's statements that by *not* investing in Luminoptics, Universal was "going to lay itself open to the charge" of attempting to stifle competition and suppress the development of a technological advance.[4]

Shortly thereafter, Einhorn retired. Ben W. Heineman, the chairman of Northwest Industries, Inc. (Northwest), Universal's parent corporation, named Otto Payonzeck as the new chief executive officer of Universal. Heineman was interested in the commercial potential of the new electronic ballast, and he wanted Universal to participate in its development. He communicated to Payonzeck his concern that Universal should not be left behind in this development. Payonzeck began investigating the various smaller companies then marketing, manufacturing or developing electronic ballasts. Two of the companies he looked into were Astec, which was manufacturing simple low-cost electronic ballasts in Asia, and Luminoptics, which was attempting to develop a more complex, "top-of-the-line" commercial electronic ballast.

Payonzeck had several conversations and meetings with Alling in late 1980 and early 1981, in the course of which Payonzeck visited Luminoptics facilities in San Ramon. Alling gave Payonzeck the business plan, and told him that Luminoptics was poised on the verge of dominating the world

---

[sic] job within a reasonable time frame. For the life of me I can't understand, or don't want to understand, why your Company has chosen not to be the leader in this new technology. Sooner or later, Universal is going to lay itself open to the charge that the two companies that dominate the business conspired, by commission or omission, to stiffle [sic] innovation to preserve their self interest. I would hope that Universal would prevent that type of accusation by getting involved with the electronic ballast in a meaningful way.

"If there is interest in some *mutually* beneficial relationship I hope you will contact me. Otherwise I will contact you when we are ready to sell ballasts."

[4]Einhorn's letter stated: "Naturally, Universal will be interested in the manufacture and sale of electronic ballasts when the technology has advanced to the point where the product is acceptable and economically feasible. We will be happy to continue to discuss the matter with you further, but up to this point the product which you are offering and the financial arrangements which you have suggested have precluded serious interest on our part.

"We must take sharp issue with your statement that by not dealing with you 'Universal is going to lay itself open to the charge that the two companies that dominate the business conspired, by commission or omission, to stiffle [sic] innovation to preserve their self interest'. As you are well aware, the ballast business is highly competitive, and I can assure you that it will remain so. Needless to say, we have not discussed electronic ballasts in any way with our competitors."

electronic ballast market. Specifically, Alling represented that Luminoptics had a large number of products already commercially available on the market; an extensive list of customers presenting immediate orders for Luminoptics's products; numerous sublicense and/or joint venture arrangements in Asia, Europe, the Middle East as well as North America; a large production capacity, "sufficient to capture 2-3% of the total worldwide market which can be expanded at very little additional cost"; a "very significant R&D [research and development] capacity to support growth plans expanding past 1990"; and "[t]he only solid state ballast that is commercially viable across a broad base both from a product and geographical point of view." It is undisputed that at the time that Alling made these representations to Payonzeck, Eastern had not been able successfully to manufacture *any* of Luminoptics's products; no one, including Luminoptics itself, had been able to produce a commercially marketable unit, either in terms of cost, design, or number of units; Luminoptics was having serious problems with its research and development capacity; and Luminoptics's very existence was imperiled by its financial instability.

As a result of his talks and visits with Alling and the material in the business plan, Payonzeck became enthusiastic about entering into an agreement with Luminoptics to manufacture and/or promote the product.[5] Alling sent Payonzeck some Luminoptics prototypes for testing by Universal's

---

[5]Both at trial and on appeal, plaintiffs have placed great reliance on a pair of letters between Alling and Payonzeck, written during this period when Alling was wooing Universal most heavily, in support of their contention that Universal promised Alling that it would fully fund his "business plan." The first letter, dated April 2, 1981, from Alling to Payonzeck, expressed interest in pursuing a "working arrangement of some sort with Universal"; stated that an "industrial partner" such as Universal "could provide valuable resources other than cash" for Luminoptics; and proposed the structuring of an option agreement between Universal and Luminoptics whereby Universal would pay up to $1 million in cash and services for an option to acquire some portion of shares in Luminoptics for between $5 and $7 million. Alling's express goal in making this proposal was to raise the money necessary "to implement the first stage of our Business Plan."

In reply, Payonzeck wrote Alling by letter dated April 16, 1981, that his visits and talks with Alling had made him "more a believer" that electronic solid state ballasts would succeed, and that he was prepared to "strongly recommend an investment in your company . . . ." But Payonzeck cautioned that before he did so, Luminoptics's pending patent would have to be finally issued, and prototype samples of Luminoptics products would have to be sent to Universal's engineering department so that it could "evaluate how many further problems we have to face." The letter concluded with general optimistic statements that "Universal and Luminoptics look to be a good marriage. We can bring a ballastry system to market quickly and have the resources and reputation to support and promote it. You appear to have the basic technology, but not yet the manufacturing expertise to produce the product. I fully believe Universal can help here also, as we have the manufacturing savvy to convert from the lab to the factory floor. We may even surprise you with some electronic componentry [*sic*] knowledge."

It was largely on the basis of this correspondence that LMP's trial attorney argued to the jury that "clearly Mr. Payonzeck . . . was acknowledging right here that they [Universal]

engineering department. The tests, which were reported in May 1981, showed that one unit failed completely; that although the other unit or units functioned properly, they were not as efficient as Alling claimed; and that the units were extremely complex, involving over 150 parts. This complexity increased the difficulty of manufacturing the units and increased their cost to between $42 and $54 per unit, and it decreased both the reliability and the longevity of their operation. In contrast, conventional ballasts such as those manufactured by Universal cost approximately $5 to $6 each, while other new electronic ballasts on the market cost approximately $25 to $28 per unit.

Nevertheless, Payonzeck continued negotiations with Alling to see if some marketing arrangement could be worked out between Universal and Luminoptics. According to Payonzeck, Universal was interested in exploring the potential idea of simultaneously marketing the Luminoptics product for the high-end, or "Cadillac" segment of the ballast market, and the low cost, simpler Astec electronic ballast for the low-end, "Volkswagen" or "Chevrolet" segment of the market. Because he initially believed Alling's representations that Luminoptics's products were already in large-scale commercial production, Payonzeck at first tried to negotiate an agreement under which Universal would market Luminoptics's products, either under Universal's label or under a different name. When it became clear that Luminoptics did not have the necessary capital to produce the products on its own, the negotiations turned to the outright purchase of Luminoptics by Universal.

Following negotiations through the summer of 1981, the parties reached agreement in September 1981 on the major financial terms of the prospective acquisition of Luminoptics by Universal, and signed a memorandum of understanding to that effect. On October 1, 1981, Universal's lawyers sent a draft of the proposed purchase and sale agreement (the Purchase Agreement) to Luminoptics's attorneys. After indicating that Luminoptics would become the "Luminoptics Division" of Universal, this draft included the following provision in paragraph 5: "The Buyer [Universal] will use its best efforts to cause the Luminoptics Division to be conducted in a profitable manner. However, the Buyer reserves the sole right to determine any amounts of capital resources which it may invest in the Luminoptics Division and to suspend, curtail or terminate the operation of the Luminoptics Division in the event that it should prove unprofitable or in the event that the Buyer should reasonably conclude in good faith that such operation will require an investment of funds which it does not consider warranted under the circumstances." The draft also included, as an addendum thereto, a proposed

were going to implement that business plan and fund it." However, this contention ignores the actual negotiations over the Purchase Agreement and the fact that Payonzeck specifically refused to include any promises about or references to the business plan in the contract.

employment agreement whereunder Universal agreed to employ Alling to manage the new Luminoptics Division.

On October 12, 1981, Luminoptics's lawyers sent Universal's attorneys a letter and memorandum with comments on and requests for change in the draft Purchase Agreement. Among the requested changes was to add to paragraph 5 a reference to Alling's "business plan," in order to tie the best efforts clause to the specifics of the business plan and to limit Universal's right to terminate the operation of Luminoptics by imposing a "fully objective" standard "in accordance with the business plan." Through its lawyers, Universal communicated to Luminoptics its rejection of any reference to the business plan in the Purchase Agreement, its refusal to commit to any particular level of funding, and its insistence on retaining the right to terminate Luminoptics if it proved unprofitable.

Subsequently, Payonzeck met with Alling to go over the proposed Purchase Agreement. Alling again asked that the Purchase Agreement include a reference to the business plan. Payonzeck again refused, insisting that Universal would not commit itself to any particular level of funding for Luminoptics.[6] After further negotiations, Payonzeck agreed to include a provision in paragraph 5 to the effect that Universal would not suspend,

---

[6]In his testimony at trial, Alling repeatedly stated that Payonzeck agreed to put the best efforts clause into the Purchase Agreement to appease Luminoptics for not including a reference to the business plan, and that in so doing he indicated to Alling that Universal would view the best efforts clause as a promise to do *at least as much* as was proposed in the business plan. Plaintiffs have based virtually their entire case at trial on this contention, arguing that it effectively reads the optimistic forecasts and ambitious proposals of the business plan into the Purchase Agreement via the best efforts clause.

However, Alling's testimony that the best efforts clause was inserted in the Purchase Agreement only after and in response to Luminoptics's request for a reference to the business plan therein is directly contradicted by the record. Luminoptics did not make its request that the business plan be included in the Purchase Agreement until after it received the draft from Universal, which already contained the best efforts clause together with the proviso expressly reserving to Universal the right to determine the level of its investment in Luminoptics.

Moreover, Alling's own testimony on this point is actually not as clear as plaintiffs' arguments to this court would have it. Although Alling at first stated that the best efforts clause was introduced into the contract to satisfy Luminoptics's request for a specific reference to the business plan, when he was specifically asked whether the best efforts clause was already in the draft of the agreement at the time, he conceded that "I may be wrong," and "I can't say for certain."

Later, although Alling conceded that Payonzeck flatly refused to include any reference to the business plan in the Purchase Agreement when Alling asked for one, he insisted that Payonzeck assured him that the best efforts clause actually constituted Universal's promise to do *more* than what was set forth in the business plan. However, the only statement by Payonzeck that Alling cites to this effect was Payonzeck's purported remark that "he did not want to be limited by the Business Plan." Alling specifically acknowledged that his understanding that Universal was promising to do more than the business plan was simply *his own interpretation* of this statement.

curtail or terminate Luminoptics for a period of at least two years after purchase; thereafter, however, it would retain the right to terminate or curtail the division if Universal viewed it as unprofitable *or* if Universal reasonably and in good faith concluded that further investment in Luminoptics was not warranted under the circumstances. Payonzeck also agreed that if Universal thereafter terminated the operation of Luminoptics, it would give Alling and the other Luminoptics shareholders the right of first refusal to repurchase the company, upon terms to be negotiated at that time.[7]

The Purchase Agreement was redrafted to reflect these negotiated changes, and as such, was executed by the parties on November 30, 1981. The Purchase Agreement contained an integration clause, expressly stating that it set forth "the entire understanding of the parties and supersedes all prior agreements and understandings of the parties relating to the subject matter hereof." It also stated that it was to be construed and enforced in accordance with the law of the State of New Jersey. Contemporaneously with the execution of the Purchase Agreement, Universal and Alling also entered into an employment agreement, employing Alling as an executive officer of Universal.

At the same time, Universal acquired an exclusive license from SLP to use its patents and technology through a license agreement, previously entered into on September 1, 1981, and effective upon Universal's acquisition of Luminoptics. This license was intended to and did supersede the previous

---

[7]In its final form, paragraph 5 of the purchase and sale agreement read as follows: "*Operation of the Luminoptics Division.* From and after the Closing and until expiration of the period during which the Cumulative Pre-Tax Earnings are to be determined pursuant to Section 2(d), the Buyer will use its best efforts to cause the Luminoptics Division to be conducted in a profitable manner. However, the Buyer reserves the sole right to determine any amounts of capital resources which it may invest in the Luminoptics Division and, at any time after a date 2 years from the Closing Date, to suspend, curtail or terminate the operation of the Luminoptics Division in the event that it then proves unprofitable or in the event that the Buyer then reasonably concludes in good faith that such operation will require an investment of funds which it or its parent corporation, Northwest Industries, Inc., does not consider warranted under the circumstances.

"In the event that the Buyer pursuant to this Section 5 terminates the Luminoptics Division prior to the expiration of the period during which the Cumulative Pre-Tax Earnings are to be determined, the Buyer shall be required to give notice of said termination to the Seller and to the Principal Shareholder, and:

"(a) As of a date 60 days after sending such notice, the Buyer shall have no further obligation or liability under either of the employment agreements . . . and each such employment agreement shall be deemed terminated; and

"(b) The Buyer agrees to grant to the Seller, or to the Principal Shareholder if the Seller is then dissolved, the right to purchase substantially all of the assets of the Luminoptics Division upon such terms as the Buyer and the Seller or the Principal Shareholder, as the case may be, are able to agree, negotiating in good faith, within 60 days following the date on which notice of said termination was sent to the Seller and to the Principal Shareholder."

exclusive license which Luminoptics had to SLP's patents and technology. It established a schedule of royalty payments, and provided that it was to be construed and enforced in accordance with California law. The License Agreement also contained an integration clause, as well as an arbitration clause requiring binding arbitration of "[a]ny controversy or claim arising out of or relating to this Agreement, or the breach thereof, . . . in accordance with the rules of the American Arbitration Association."

Shortly after acquiring Luminoptics, Payonzeck discovered that it had no products to speak of on the commercial market, and that Alling had failed to tell him that the units initially shipped by Eastern were defective. Universal continued to have difficulties with Eastern's performance after the acquisition of Luminoptics.

In 1982, Underwriters Laboratories (UL), the safety testing arm of the insurance industry, removed its approval from all solid state electronic ballasts produced by all manufacturers until each ballast could be tested and meet UL's safety standards. Production of the Luminoptics Division's ballasts at Eastern was shut down for five or six weeks while the Luminoptics ballasts were retested at UL. After testing, UL granted the Luminoptics ballasts its approval again. Thereafter, when Universal told Eastern to commence production again, Eastern told Universal that it wanted to terminate its contract to produce Luminoptics ballasts because of the difficulties it had been having. A termination was negotiated, and Universal was forced to buy back much of the inventory at Eastern, including work in progress.

In January 1982, Universal had entered into a contract with Astec to design and manufacture a low-cost electronic ballast to be marketed by Universal, known as "Genesis." After Eastern had terminated its manufacturing contract, Universal turned to Astec to determine if it could manufacture commercially marketable electronic ballasts on the Luminoptics design. After examining the Luminoptics design and the products manufactured by Eastern, Astec informed Universal that it would have to redesign both the product itself and its own factory in order to produce an electronic ballast on the Luminoptics model. The necessary redesigns were not completed for over a year, and no Luminoptics products using the SLP technology were ready for shipment from Astec until 1985.

In the meantime, progress toward producing Luminoptics electronic ballasts based on SLP technology had already run into difficulty. In the latter half of 1983, Alling hired Lawrie Eaton to be the director of engineering for the Luminoptics Division at Universal. Soon after starting, Eaton discovered to his dismay that the division had neither a reliable commercial product nor

any inventory to sell. All that it had were approximately 20,000 units that had been manufactured by Eastern and that had to be rebuilt because they were defective or had fundamental design problems. Most of the orders for Luminoptics products which Alling had represented to Universal at the time of the acquisition never came to fruition. The few sales which did actually take place, such as a large sale to Citicorp, resulted in significant losses to Universal when the ballasts proved defective and repeatedly failed. Universal was forced by its warranty obligations to replace failed Luminoptics ballasts for a two-year period after installation, which two-year period was renewed for every new replacement ballast installed. Because the replacement ballasts often failed as well, Universal was constantly replacing ballasts at great cost to itself.

Around this time, a dispute arose between Universal and SLP over the latter's licensing of a model of a new low-cost electronic ballast created by Stevens to another company. Alling told Payonzeck that SLP was now using technology that had been funded by Luminoptics and licensing it to other companies, which Payonzeck interpreted as a violation of the License Agreement between Universal and SLP.

The dispute was resolved by a new contract entered into on July 1, 1983, between Universal's Luminoptics Division and SLP (the Sublicense Agreement), whereunder the 1981 License Agreement was terminated and Universal gave up its exclusive license to the SLP patents and technology. SLP granted a new exclusive license to a new corporation created by Stevens for tax purposes, called Program Resources, Inc. (PRI), and later renamed Calmont. PRI in turn gave Universal and its Luminoptics Division a nonexclusive sublicense to use the subject technology; but Universal was deprived of the right to grant any sublicenses itself, except insofar as necessary for arranging the manufacture of Luminoptics products by third parties on behalf of Universal. The Sublicense Agreement acknowledged that Universal had previously loaned $400,000 to SLP in connection with the 1981 License Agreement and that SLP still owed that principal amount to Universal; and it set forth royalties to be paid by Universal to PRI, based on the net selling price of Luminoptics units sold by Universal. SLP in turn gave up royalties under the 1981 agreement; agreed to hold Universal "harmless from all claims, whether asserted, unasserted or contingent, against [SLP or PRI] or any general partner thereof, including any and all claims relating to the [Luminoptics] Technology"; and agreed to submit any controversy or claim arising out of the Sublicense Agreement to binding arbitration. The Sublicense Agreement also contained an integration clause.

By late 1983, Universal's Luminoptics Division was experiencing significant and growing losses. Payonzeck replaced Alling with John Hudson as

head of the division, and moved Alling to marketing. When the low-priced Genesis ($25-$29) products began arriving from Astec, Hudson wanted to concentrate on marketing them under the Luminoptics label to stanch the loss of revenues from the SLP designed products and to meet the anticipated introduction of low-cost electronic ballasts by Universal's competitors. There was some disagreement about the timing of such an effort. Payonzeck in particular was concerned with an industry rumor that Advance Transformer Company (Advance)—Universal's principal competitor—was preparing to introduce a $9 electronic ballast on the market; he wanted to have a complete line of electronic ballasts ready and available before introducing only one kind of ballast.

This development upset Alling, who was continuing to vigorously promote the SLP products despite the lack of any inventory and the slow progress in redesigning the prototype. Alling complained that Universal was not providing the Luminoptics Division with enough funding, and frequently asserted his belief that Universal was conspiring to keep Luminoptics off the market. As a result of continuing friction, Alling resigned from Universal in September 1984.

In 1985 and 1986, through a series of acquisitions, Universal became a subsidiary of MagneTek, Inc., the market leader in sale of electronic ballasts in the United States. The Luminoptics Division of Universal continued to develop electronic ballasts using, among other things, the technology it now sublicensed from PRI (Calmont), and manufactured by Astec. The technical defects and problems in the Luminoptics design were solved between 1983 and 1984. The first shipments of the new Luminoptics products arrived in late 1984 and 1985, and sales by the Luminoptics Division increased thereafter. However, no actual profit was earned from the sale of these products in the five-year period after the original acquisition of Luminoptics. A variety of factors, including a stabilization in energy prices starting in 1981, the disruption of the OPEC oil cartel and the 1982-1983 business recession, contributed to the relatively low demand for electronic ballasts. Meanwhile, Alling revived his original corporation under the new name LMP, and continued to attempt to market SLP ballast technology on his own.

II

PROCEDURAL BACKGROUND

In September 1984, LMP filed suit in federal district court against Universal, Northwest, Advance and its parent company, alleging that the defendants had violated the Sherman Antitrust Act by monopolizing the ballast market for the purposes of restraining and suppressing competition from manufacturers of electronic ballasts. This federal lawsuit also alleged California state law claims for restraint of trade and price fixing under the

Cartwright Act, fraud and deceit, breach of contract, and interference with advantageous business relationships. The district court ordered the antitrust claims dismissed for failure to state a claim upon which relief could be granted, on the grounds that LMP "lacks standing to seek relief for the alleged federal antitrust violation." The district court also dismissed the pendant state law claims.

Simultaneously with the filing of the federal action, Alling filed two lawsuits in Alameda County Superior Court; one in his own name against Universal alleging violation of the Cartwright Act and wrongful termination of his employment contract; and the other, in the name of LMP, against Universal and Northwest, among others, asserting the same claims as in the federal action. In 1985, LMP amended its complaint to delete the Cartwright Act cause of action. In 1986, LMP moved for permission to file a second amended complaint adding SLP and Calmont as plaintiffs, alleging that they were third party beneficiaries of the Purchase Agreement. Universal and Northwest opposed this motion on the grounds that SLP and Calmont could not be third party beneficiaries of the Purchase Agreement as a matter of law, and that in any event any claims they had against Universal and Northwest had to be arbitrated under the arbitration clauses of the License Agreement and the Sublicense Agreement. In response, SLP and Calmont told the court that they were not seeking to sue on the License Agreements, but only on the Purchase Agreement. The trial court granted the motion for leave to amend.

Subsequently, plaintiffs filed a third amended complaint, realleging the previously dismissed Cartwright Act claims on behalf of LMP, SLP and Calmont. No other changes were made from the second amended complaint. In July 1987, Universal and Northwest moved for summary judgment against SLP and Calmont on the grounds, among other things, that their claims were barred by the arbitration clauses in the License Agreement and the Sublicense Agreement. In response, SLP and Calmont again represented to the court that they were not making any claims under either licensing agreement; that they "do not believe and have not claimed the License was ever breached"; and that they were proceeding solely as alleged third party beneficiaries of the best efforts provision in the Purchase Agreement.

In September 1987, the trial court denied the motion for summary judgment on the basis of its discretion pursuant to Code of Civil Procedure section 1281.2 to order a trial instead of arbitration, on the grounds that Universal had failed to file a motion to compel arbitration under the licensing agreements, and that there were triable issues of fact as to SLP and Calmont's third party beneficiary claim. The trial court did grant Universal's motion for summary adjudication as to LMP's antitrust claim, on the

grounds that it was collaterally estopped by the federal district court's previous dismissal thereof. The antitrust claims of SLP and Calmont, however, were allowed to proceed.

In addition to these motions, the parties made numerous other pretrial motions, including Universal's motion *in limine*, on parol evidence grounds, to prohibit reference to the Luminoptics "business plan" as part of the Purchase Agreement. In opposition to the motion *in limine*, LMP, SLP and Calmont argued that Universal had promised to "implement the business plan," and that its "refusal to do so is the *raison d'etre* of plaintiffs' claims."

Trial commenced on June 1, 1989. The trial court first announced its tentative decision to deny Universal's motion to exclude reference to the business plan, but to grant the motion to prohibit LMP from claiming that there was an oral contract to incorporate the business plan into the Purchase Agreement. After this ruling, the attorney for LMP, SLP and Calmont argued that they should not be barred from arguing that the business plan had been incorporated by the parties into the Purchase Agreement. He urged that the business plan—which he called "the centerpiece" of the parties' negotiations—was necessary to interpret the meaning of the best efforts clause.

The trial court responded that "it would be improper for the plaintiff to allege that the defendant agreed to be bound by every term of the business plan, because I think it is inconsistent with the [Purchase Agreement] and it appears to be an integrated agreement. [¶] On the other hand, I think it is proper and appropriate to show that the business plan was discussed between the parties and for plaintiff to argue that this gives flesh and meaning to [the] best efforts [clause]. They could not argue that explicitly the defendant agreed to be bound by all of the requirements of that business plan."

Thereafter, the trial court permitted LMP's attorney to discuss the business plan at great length in his opening statement to the jury. He argued that the best efforts clause meant that Universal was required to give its "best possible" efforts, "all that was possible by these wealthy defendants [Universal and Northwest] to achieve the projections" in Alling's business plan; that the business plan was a "five-year plan" which "was to govern the operation of Luminoptics over five years"; that it set forth detailed prescriptions of what was to be done and how much was to be spent; that Alling would not have entrusted the Luminoptics technology to Universal "unless they pledged to fund the business plan, at the least"; that the projections in the business plan "could be easily achieved"; and that Universal told Alling that it "would fund the business plan and more."

When LMP's attorney first attempted to have the business plan admitted in evidence, Universal's attorney promptly renewed the prior objection on

grounds of parol evidence. After extensive voir dire of Alling on the subject of the business plan, and Universal's continued objection on parol evidence grounds, the trial court indicated that LMP had not established a foundation for admissibility of the business plan in view of Universal's parol evidence objection.[8]

In further voir dire outside the presence of the jury, Alling again confirmed that he had asked that the business plan be attached to the Purchase Agreement and included therein by reference; and that Payonzeck had refused, saying that "he did not want to be limited" by the business plan. Specifically rejecting LMP's assertion that this statement implied a promise "to go beyond" the business plan in terms of funding, the trial court stated: "Not limited by something means I'll do what I want to without regard to that."

Nevertheless, after further offers of proof, in which Alling gave more testimony concerning his interpretation of statements made by Payonzeck about the number of Luminoptics units he hoped to produce, which Alling testified led him to believe that Universal would spend more on promoting Luminoptics than envisioned by the business plan, the trial court permitted the admission of the business plan, overruling Universal's parol evidence objection. The trial court said the plan itself was enough of an integral part of the relationship between the parties that it needed to be disclosed to the jury.

After the case was submitted to the jury a deadlock in deliberations ensued for a period of a month. In response to questions from the jury, the

---

[8]In response to the arguments of LMP's attorney that the business plan was "highly relevant to establish what the parties intended when Universal promised to fund the business plan," and that it was evidence as to "what the parties obviously meant by the best efforts clause, when the best efforts clause was made," the trial court stated: "You've got a cause of action here for a breach of contract. And it's an integrated contract. These preliminary negotiations may have some tenuous relevance on the issues in this case but at this point unless there is established a foundation for the admission of this massive documentary material which preceded the formation of the contract I'm going to be sustaining the [parol evidence] objections."

Outside the presence of the jury, the trial court went somewhat further in explaining to LMP's attorney the grounds for excluding the business plan: "When I made my preliminary ruling, what you represented to the Court was that the testimony was going to be that during the negotiations Mr. Payonzeck, or someone on behalf of the defendants, said, with regard to the business plan, 'Our promise of best efforts is at least as good as the business plan, and more. . . . Now, I haven't heard that testimony. What I've heard so far is this: We want the business plan included. Mr. Payonzeck says no, I don't want to be restricted. I'll give you a best efforts clause.' [¶] Now, if it would be admissible for anything, it would be for what best efforts is not. Mr. Payonzeck, according to this testimony, is rejecting the business plan and opting instead for something else."

trial court permitted it to render a verdict on punitive damages, despite its deadlock on the issue of compensatory damages. The jury awarded $5 million punitive damages to LMP and $2.5 million in punitive damages to SLP and Calmont together. After the Christmas recess, the jury returned special verdicts awarding $6.101 million compensatory damages to LMP and $12.17 million compensatory damages to SLP and Calmont together. It found Universal liable to LMP, SLP and Calmont for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, and tortious interference with advantageous business relations. The jury also returned special verdicts exonerating Northwest (Universal's parent) from all liability, and finding for Universal on the antitrust and wrongful termination claims.

After denying Universal's motions for judgment notwithstanding the verdict or for a new trial, the trial court entered judgment in accordance with the jury verdicts.

### III

#### PAROL EVIDENCE

■ Universal contends that the business plan or prospectus, and the testimony relating thereto, and the use the plaintiffs were permitted to make of it, violated the parol evidence rule, and that the trial court's rulings in this regard constituted reversible error. We agree.

*General Rule*

■ The parol evidence rule generally prohibits the introduction of any extrinsic evidence, whether oral or written, to vary, alter or add to the terms of an integrated written instrument. (*Tahoe National Bank* v. *Phillips* (1971) 4 Cal.3d 11, 23 [92 Cal.Rptr. 704, 480 P.2d 320]; *Imbach* v. *Schultz* (1962) 58 Cal.2d 858, 860 [27 Cal.Rptr. 160, 377 P.2d 272]; *Blumenfeld* v. *R.H. Macy & Co.* (1979) 92 Cal.App.3d 38, 44 [154 Cal.Rptr. 652]; 2 Witkin, Cal. Evidence (3d ed. 1986) Documentary Evidence, § 960, p. 908.) "An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement." (Rest.2d Contracts, § 209, subd. (1).) In California, the rule is embodied in Code of Civil Procedure section 1856, which states that "[t]erms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement." (Code Civ. Proc., § 1856, subd. (a).)

The parol evidence rule is not merely a rule of evidence concerned with the method of proving an agreement; it is a principle of substantive law. The

rule derives from the concept of an integrated contract, and is based on the principle that when the parties to an agreement incorporate the complete and final terms of the agreement in a writing, such an "integration" in fact becomes the complete and final contract between the parties, which may not be contradicted by evidence of purportedly collateral agreements. "The point then is, not how the agreement is to be proved, because as a matter of law the writing is the agreement. Extrinsic evidence is excluded because it cannot serve to prove what the agreement was, this being determined as a matter of law to be the writing itself. The rule comes into operation when there is a single and final memorial of the understanding of the parties. When that takes place, prior and contemporaneous negotiations, oral or written, are excluded; or, as it is sometimes said, the written memorial supersedes these prior or contemporaneous negotiations. [Citations.]" (*Estate of Gaines* (1940) 15 Cal.2d 255, 264-265 [100 P.2d 1055]; see also *BMW of North America, Inc.* v. *New Motor Vehicle Bd.* (1984) 162 Cal.App.3d 980, 990 [209 Cal.Rptr. 50]; *Buffalo Arms, Inc.* v. *Remler Co.* (1960) 179 Cal.App.2d 700, 709 [4 Cal.Rptr. 103].)

■ The determination of whether the agreement in question is an "integration"—that is, whether it was intended by the parties as a final, complete and exclusive statement of their agreement with respect to the terms included in the agreement—is a question of law to be determined by the court. (Code Civ. Proc., § 1856, subd. (d); *Mobil Oil Corp.* v. *Handley* (1978) 76 Cal.App.3d 956, 961 [143 Cal.Rptr. 321]; *Brawthen* v. *H & R Block, Inc.* (1975) 52 Cal.App.3d 139, 145-146 [124 Cal.Rptr. 845].) "The question of whether a contract is 'integrated' . . . is clearly not one of those 'traditionally regarded as jury questions.' [Citations.] The matters to which the court must address itself in determining whether the evidence of an oral agreement should go to the jury are such questions as (1) whether the written agreement appears to state a complete agreement; (2) whether the alleged oral agreement directly contradicts the writing; (3) whether the oral agreement might naturally be made as a separate agreement; [and] (4) whether the jury might be misled by the introduction of the parol testimony. (*Masterson* v. *Sine* [1968] 68 Cal.2d 222, 225-228 [65 Cal.Rptr. 545, 436 P.2d 561].)" (*Brawthen* v. *H & R Block, Inc., supra,* 52 Cal.App.3d at p. 146.)

Evidence of surrounding circumstances and prior negotiations *may* be admitted for the limited purpose of assisting the trial court in determining whether a document was intended to be the final agreement of the parties superseding all other transactions. (*Schwartz* v. *Shapiro* (1964) 229 Cal.App.2d 238, 251 [40 Cal.Rptr. 189]; 2 Witkin, Cal. Evidence, *op. cit. supra,* §§ 970-971, pp. 916-918.) ■ Moreover, even if the court determines that a particular written contract is integrated and was intended by the

parties as the final expression of their agreement, the terms set forth therein "may be *explained or supplemented* by evidence of *consistent* additional terms *unless* the writing is intended also as a complete and *exclusive* statement of the terms of the agreement." (Code Civ. Proc., § 1856, subd. (b), italics added.) Thus, a prior or contemporaneous collateral oral agreement relating to the same subject matter may sometimes be admitted in evidence. However, this is true only where it is *not inconsistent* with the terms of the integration. (*Masterson* v. *Sine* (1968) 68 Cal.2d 222, 227-230 [65 Cal.Rptr. 545, 436 P.2d 561]; *Pollyanna Homes, Inc.* v. *Berney* (1961) 56 Cal.2d 676, 679 [16 Cal.Rptr. 345, 365 P.2d 401]; *Simmons* v. *Cal. Institute of Technology* (1949) 34 Cal.2d 264, 274 [209 P.2d 581]; *Skone* v. *Quanco Farms* (1968) 261 Cal.App.2d 237, 243 [68 Cal.Rptr. 26]; 2 Witkin, Cal. Evidence, *op. cit. supra*, §§ 962, 990-994, pp. 910, 936-942.)

*The Purchase Agreement*

Here, the trial court itself determined, and stated on the record more than once, that the Purchase Agreement was an integrated contract, and that Alling's "business plan" or prospectus was inconsistent with it. The trial court was correct in this determination. The Purchase Agreement contained an integration clause, providing that "this Agreement sets forth the entire understanding of the parties and supersedes all prior agreements and understandings of the parties relating to the subject matter hereof. This Agreement may be modified or terminated only in a writing signed by all of the parties." Moreover, paragraph 5 of the Purchase Agreement expressly states that Universal "reserves the sole right to determine any amounts of capital resources which it may invest in the Luminoptics Division"; and goes on to give Universal the right "to suspend, curtail or terminate the operation of the Luminoptics Division in the event that it then proves unprofitable or in the event that the Buyer then reasonably concludes in good faith that such operation will require an investment of funds which it or its parent corporation . . . does not consider warranted under the circumstances."

These written contractual provisions giving Universal sole discretion to determine the amount of capital resources to commit to the Luminoptics Division are clearly inconsistent with the statements and plans set out in the business plan, which envision the expenditure of at least $47 million over a period of 5 years on the development of the Luminoptics ballast. Even without this stark textual conflict between the Purchase Agreement and the business plan, the undisputed evidence in the record shows that Universal specifically refused Alling's request that the business plan be incorporated by reference in the Purchase Agreement. It is difficult to imagine a clearer indication of the inconsistency of the Purchase Agreement and the business plan.

Thus, the Purchase Agreement met the requisites of an integration. (*Masterson* v. *Sine, supra,* 68 Cal.2d at pp. 225-230; *Brawthen* v. *H & R Block, Inc., supra,* 52 Cal.App.3d at p. 146.) Because the terms of the Purchase Agreement were inconsistent with any inference that Universal had orally undertaken to guarantee the funding of the business plan in accordance with the statements and projections contained therein, the parol evidence rule barred the admission of the business plan either to supplement the express terms of the integrated Purchase Agreement, or to vary or define any provision of that contract, including the best efforts provision. Neither was it proper for the trial court to admit evidence of an alleged oral agreement to fund the business plan, since such an alleged agreement was also inconsistent with the terms of the integrated written contract. (Code Civ. Proc., § 1856, subd. (b); *Masterson* v. *Sine, supra,* 68 Cal.2d at pp. 227-230; *Pollyanna Homes, Inc.* v. *Berney, supra,* 56 Cal.2d at p. 679; *Simmons* v. *Cal. Institute of Technology, supra,* 34 Cal.2d at p. 274; *Skone* v. *Quanco Farms, supra,* 261 Cal.App.2d at p. 243; 2 Witkin, Cal. Evidence, *op. cit. supra,* §§ 962, 990-994, pp. 910, 936-942.)[9]

*Fraud*

■ Plaintiffs argue that even if the business plan was parol evidence and inadmissible to vary the terms of the written Purchase Agreement, it was admissible under the so-called "fraud exception" to the parol evidence rule contained in subdivision (g) of Code of Civil Procedure section 1856, which provides in pertinent part: "This section does not exclude other evidence . . . to establish illegality or fraud." They contend that the business plan was relevant to show that Universal fraudulently induced Luminoptics to part with its technology by falsely promising to implement the projections in the business plan, while having no intention to perform that promise.

We disagree. ■ "Promissory fraud" is a promise made without any intention of performing it. (Civ. Code, § 1572, subd. 4; *Coast Bank* v. *Holmes* (1971) 19 Cal.App.3d 581, 591 [97 Cal.Rptr. 30].) The fraud exception to the parol evidence rule does not apply to such promissory fraud if the evidence in question is offered to show a promise which contradicts an integrated written agreement. Unless the false promise is either independent of or consistent with the written instrument, evidence thereof is inadmissible. (*Simmons* v. *Cal. Institute of Technology, supra,* 34 Cal.2d at pp. 274-275; *Bank of America etc. Assn.* v. *Pendergrass* (1935) 4 Cal.2d 258, 263

[9]The same result follows under the law of New Jersey, in accordance with which the Purchase Agreement itself provided that it was to be construed and enforced. (*Atlantic Northern Airlines* v. *Schwimmer* (1953) 12 N.J. 293 [96 A.2d 652, 656]; *Schlossman's, Inc.* v. *Radcliffe* (1950) 3 N.J. 430 [70 A.2d 493, 495]; *Flavorland Industries* v. *Schnoll Packing* (1979) 167 N.J.Super. 376 [400 A.2d 883, 885]; *Winoka Village* v. *Tate* (1951) 16 N.J.Super. 330 [84 A.2d 626, 628].)

[209 P.2d 581]; *West v. Henderson* (1991) 227 Cal.App.3d 1578, 1583-1584 [278 Cal.Rptr. 570]; *Continental Airlines, Inc.* v. *McDonnell Douglas Corp.* (1989) 216 Cal.App.3d 388, 418-421 [264 Cal.Rptr. 779].)

The law in California was stated by our Supreme Court as follows: "Our conception of the rule which permits parol evidence of fraud to establish the invalidity of the instrument is that it must tend to establish some independent fact or representation, some fraud in the procurement of the instrument or some breach of confidence concerning its use, and not a promise directly at variance with the promise of the writing." (*Bank of America etc. Assn.* v. *Pendergrass, supra,* 4 Cal.2d at p. 263.) The law in New Jersey is the same. (*Winoka Village* v. *Tate, supra,* 84 A.2d at p. 628 [" 'The general rule is clear that a parol agreement which is in terms contradictory of the express words of a contemporaneous or subsequent written contract, properly interpreted, necessarily is ineffectual and evidence of it inadmissible, whether the parol agreement be called collateral or not.' "].)

Here, plaintiffs offered the business plan for the express purpose of showing a fraudulent oral promise which was directly at variance with the terms of the Purchase Agreement. The alleged unequivocal oral promise to fund the business plan, elicited in testimony and referred to repeatedly by plaintiffs' trial attorney both in opening and in closing argument, varied and contradicted the specific language in paragraph 5 of the Purchase Agreement giving Universal "the sole right to determine any amounts of capital resources which it may invest in the Luminoptics Division . . . ." The evidence of that alleged promissory fraud was therefore improperly admitted. (*Continental Airlines, Inc.* v. *McDonnell Douglas Corp., supra,* 216 Cal.App.3d at pp. 419-421.)

*Surrounding Circumstances*

We have concluded that the trial court erred in admitting the business plan either to supplement, vary or define the express terms of the Purchase Agreement, or as evidence of an alleged oral agreement to fund the business plan. By this ruling we do not find the business plan inadmissible for all purposes.

Code of Civil Procedure section 1860 provides: "For the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument, and of the parties to it, may also be shown, so that the Judge be placed in the position of those whose language he is to interpret." Indeed, defendants themselves submitted a proposed jury instruction to this effect. Plaintiffs argue that the business plan

constituted part of the background circumstances surrounding the negotiation of the Purchase Agreement between the parties, and this is undeniably true. The statements in the business plan are not agreements between the parties or promises made by Universal, but instead are representations made by Alling and Luminoptics, and considered by Universal in the negotiating process. As such, they are not promises or terms of agreement at variance with the terms of the Purchase Agreement. To this extent, the business plan was not inadmissible. (Code Civ. Proc., § 1856, subds. (a), (b); *Continental Airlines, Inc.* v. *McDonnell Douglas Corp., supra,* 216 Cal.App.3d at p. 421, fn. 25.)

This does not mean, however, that the business plan may be used to expand or define the obligations of Universal under the "best efforts" clause in the Purchase Agreement. Nevertheless, at trial, testimony was received that the business plan was the "minimum" that Universal must do to fulfill its best efforts obligations under the Purchase Agreement. To permit the use of the business plan under this guise would be to circumvent the parol evidence rule and admit the inadmissible through the back door. Quite simply, the business plan may be seen and considered by the jury as part of the parties' correspondence. But no testimony may be permitted which seeks to modify and enlarge the express terms of the Purchase Agreement with the statements made in the business plan, for the reasons we have already stated. We cannot accept plaintiffs' position that "Universal's oral promises to implement the business plan were admissible because they did not contradict Universal's agreements with plaintiffs." In this case, although the business plan by itself may have been admissible, defendants' parol evidence objections were overruled and the business plan was consistently used for the wrong purposes, to the extent that it was treated throughout the trial, in both examination and argument, as a part of the contract between the parties. This was error. The trial court recognized early on that the business plan could only be admitted for limited purposes, but then permitted plaintiffs to use it as the overriding test for determining whether Universal breached the Purchase Agreement.

*Prejudice*

■ It remains for us to determine whether the trial court's erroneous admission of evidence in respect to the business plan was so prejudicial as to require reversal. We conclude that it was.

Plaintiffs' entire case was built on the allegation that Universal had promised to fund the plans set out in Alling's business plan, and that the parties intended that the proposals of the business plan would be "read into"

the best efforts clause of the Purchase Agreement. Without that contention, plaintiffs would have been at a loss to avoid the express reservations of rights in paragraph 5 of the Purchase Agreement, entitled "Operation of the Luminoptics Division." Aside from the business plan and the alleged oral promises made in connection therewith, plaintiffs had virtually no evidence of any factual representations by Universal to support either their fraud allegation or their interpretation of the best efforts provision.[10]

This case is therefore unlike *Continental Airlines, Inc.* v. *McDonnell Douglas Corp., supra*, 216 Cal.App.3d at pages 422-428, where the appellate court held that the erroneous admission of parol evidence was harmless because the inadmissible evidence was *not* the only thing which the plaintiff emphasized in examining witnesses and in closing argument. In contrast, here the business plan was practically the *only* thing plaintiffs relied on throughout their entire case. Even the specific amounts they claimed in damages were based in large part on the projections and extrapolations in the business plan.

## IV

### CLAIMS BY SLP AND CALMONT

Universal contends that the trial court prejudicially erred in permitting the claims of SLP and Calmont to go to the jury, because (1) neither SLP nor Calmont could have been a third party beneficiary to the Purchase Agreement, and (2) both SLP and Calmont were estopped from asserting any claims for damages based on alleged breach of their license agreements. We disagree with Universal's first contention but find that its second claim of error is meritorious.

### Third Party Beneficiary

Under both California and New Jersey law, a party cannot establish third party beneficiary status unless he or she carries the burden of proving that the contracting parties' intended purpose in executing their agreement was to confer a direct benefit on the alleged third party beneficiary. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, §§ 653-657,

---

[10]Plaintiffs call our attention to Payonzeck's April 1981 letter expressing the confidence that Universal could bring Luminoptics's ballast to market "quickly" and that it had "the resources and reputation to support and promote it." However, this letter was written prior to the parties negotiating the Purchase Agreement. Furthermore, unlike the specific funding plans and proposals in the business plan, Payonzeck's statements in this letter are very general, and are not in conflict with the reservations contained in paragraph 5 of the Purchase Agreement.

pp. 593-597; *Broadway Maintenance Corp.* v. *Rutgers* (1982) 90 N.J. 253 [447 A.2d 906, 909]; *Borough of Brooklawn* v. *Brooklawn Housing Corp.* (1940) 124 N.J.L. 73 [11 A.2d 83, 85]; *Moorestown Management* v. *Moorestown Bookshop* (1969) 104 N.J.Super. 250 [249 A.2d 623, 628].) It is not necessary that the intent to benefit the third party be manifested by the promisor; it is sufficient that the promisor *understand* that the promisee has such intent. (*Lucas* v. *Hamm* (1961) 56 Cal.2d 583, 591 [15 Cal.Rptr. 821, 364 P.2d 685]; *Marina Tenants Assn.* v. *Deauville Marina Development Co.* (1986) 181 Cal.App.3d 122, 129 [226 Cal.Rptr. 321]; *Shepherd* v. *Miles & Sons, Inc.* (1970) 10 Cal.App.3d 7, 15 [89 Cal.Rptr. 23]; 1 Witkin, Summary of Cal. Law, Contracts, *supra*, § 656, p. 595.) Neither is it necessary that the contract identify or refer to the third party beneficiary by name; the beneficiary may recover if he or she can show that it was intended that he or she be benefited by the contract. (*COAC, Inc.* v. *Kennedy Engineers* (1977) 67 Cal.App.3d 916, 920 [136 Cal.Rptr. 890]; 1 Witkin, Summary of Cal. Law, Contracts, *supra*, §§ 666-667, pp. 604-607.)

■ In this case, there was substantial evidence in the record sufficient to support the finding that Universal, the promisor, understood that Luminoptics, as the predecessor of plaintiff LMP and the promisee in this case, intended to benefit SLP in entering into the Purchase Agreement. This is not, as Universal suggests, a situation analogous to a real estate sale, with SLP filling the role of a real estate broker who incidentally benefits from the contract of sale by receiving a commission thereon. SLP was essentially the *owner* of the patented electronic ballast technology in this case. It had licensed the right to use its patents and technology to Luminoptics. In entering into the Purchase Agreement with Universal, Luminoptics, through Alling, was clearly hoping to greatly expand the commercial potential of the SLP patents and technology and quicken the pace of its market development. Universal, as promisor, was aware of this. SLP was not simply an incidental beneficiary of this desire on Alling's part, reaping some relatively minor percentage of profit therefrom; by intent, it was to be directly and substantially benefited through the anticipated results of the Purchase Agreement.

The concurrent License Agreement between SLP and Universal was one obvious indication of this intent. The validity and effectiveness of the License Agreement and the Purchase Agreement were mutually contingent upon each other; expressly, neither one could go into effect without execution of the other. There was substantial evidence adduced at trial that SLP relied on the provisions of the Purchase Agreement in agreeing to license the subject technology to Universal at different royalty rates, that both Luminoptics and Universal considered SLP's needs and rights in negotiating the Purchase Agreement, and that Alling, as a representative of *both* Luminoptics and SLP, intended that SLP benefit from the Purchase Agreement.

Thus, although the judgment in favor of SLP must be reversed because of our parol evidence ruling, there was no error in permitting the jury to find that SLP was a third party beneficiary of the best efforts provision of the Purchase Agreement.

 The question whether Calmont was also a third party beneficiary of the Purchase Agreement poses a different problem. Calmont was not in existence at the time of the execution of the 1981 Purchase Agreement; it was not formed until the later agreements of 1983. At that point, as a result of the dispute between SLP and Universal, the old License Agreement was terminated, and Calmont was formed to be the new exclusive licensee of the SLP patents and technology. Calmont in turn granted a nonexclusive sublicense to Universal. Calmont was not a successor to SLP; it was an entirely new corporation formed essentially to be a successor to Universal itself as the primary licensee of the SLP patents and technology. Its existence could not possibly have been foreseen or considered by the parties entering into the Purchase Agreement.

Beneficiary status is established as of the time of contracting. (*Rieder Com. v. North Brunswick Tp.* (1988) 227 N.J.Super. 214 [546 A.2d 563, 567].) Calmont therefore could not have been an intended third party beneficiary thereof as a matter of law. Thus, it was error on the part of the trial court to permit the jury to find that Calmont was a third party beneficiary of the Purchase Agreement, and the award as to Calmont must be reversed.

*Estoppel*

 Universal argues that the trial court erred in permitting SLP and Calmont to assert claims for breach of the implied covenant of good faith and fair dealing under the License Agreement and the Sublicense Agreement. It contends that plaintiffs waived the right to make claims under the licensing agreements by failing to seek arbitration under the exclusive arbitration clauses in those agreements, and by repeatedly representing to the trial court that they were not pursuing claims under the licensing agreements in this action. We agree.

The record shows that when plaintiffs first sought to introduce claims by SLP and Calmont into this action, Universal opposed them on the grounds that such claims were barred by the arbitration clauses in the License

Agreement and the Sublicense Agreement.[11] At that time, plaintiffs represented to the court that the License Agreement "is not being sued upon in this action;" that "[t]he claims of SLP and Calmont are based entirely upon the Purchase and Sale Agreement and are merely an attempt to enforce Universal's obligations under that Agreement"; and that "SLP and Calmont are not, in any way, suing upon their License Agreement with Universal." They specifically and explicitly made these representations to refute defendants' argument "that any claims of SLP and Calmont must be arbitrated under the terms of their License Agreement with Universal."

This issue was raised again in connection with defendants' motion for summary adjudication against SLP and Calmont on the grounds, inter alia, that the causes of action which they had raised could not be brought without having first sought arbitration. In opposition to this motion, plaintiffs again told the trial court that they "do not believe and have not claimed the License was ever breached. . . . [T]he breach that is the subject of plaintiffs' complaint is of the contract between Universal and LMP [the Purchase Agreement], which contract provides that Universal must employ its 'best efforts' to manufacture and sell the product that uses the technology developed by SLP. It is this obligation that SLP and Calmont, as third party beneficiaries, seek to enforce."

Evidence Code section 623 provides: "Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it." The principle is well established that once a party has gained an advantage on the basis of specific representations to the trial court, it is not thereafter permitted to disavow its previous representations. (*Crest Catering Co.* v. *Superior Court* (1965) 62 Cal.2d 274, 278 [42 Cal.Rptr. 110, 398 P.2d 150]; *Rubin* v. *Los Angeles Fed. Sav. & Loan Assn.* (1984) 159 Cal.App.3d 292, 298 [205 Cal.Rptr. 455]; *Kleinecke* v. *Montecito Water Dist.* (1983) 147 Cal.App.3d 240, 245 [195 Cal.Rptr. 58]; *Harper* v. *Kaiser Cement Corp.* (1983) 144 Cal.App.3d 616, 619-621 [192 Cal.Rptr. 720]; *In re Marriage of Valle* (1975) 53 Cal.App.3d 837, 840-841 [126 Cal.Rptr. 38].)

---

[11]The relevant provision of the License Agreement, section 11.05 thereof, provided as follows: "*Arbitration.* Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration in accordance with the rules of the American Arbitration Association. The parties agree that the arbitration shall take place in San Francisco, California and shall be governed by California law. The award rendered by the Arbitrator shall be final, and the judgment may be entered on it in accordance with applicable law in any court having jurisdiction thereof." The 1983 Sublicense Agreement between Universal's Luminoptics Division, SLP and PRI (the predecessor of Calmont) was virtually identical in wording.

Here, plaintiffs by their own actions and statements clearly led both the trial court and Universal to believe that they were waiving any claims they might have under the two licensing agreements. Plaintiffs' current assertion —that their third amended complaint claims of breach of the implied covenant of good faith and fair dealing were intended to cover the license agreements as well as the Purchase Agreement—is not convincing.[12] It is clear both from the wording and the context of those claims, as well as from what plaintiffs expressly represented to the trial court at the time, that the only implied covenant they were suing on was that in the Purchase Agreement. Nonetheless, over Universal's strenuous objections, the trial court permitted plaintiffs at the close of trial to go to the jury on the claim that defendants had breached the implied covenant of good faith and fair dealing *in the licensing agreements*, as opposed to the Purchase Agreements.

This was error. In light of the verdicts and judgment in favor of SLP and Calmont for breach of the implied covenant of good faith and fair dealing, the error was prejudicial, and we reverse the judgment on this ground.

## V

### Cross-appeals*

. . . . . . . . . . . . . . . . . . . . . . . .

## VI

### Disposition

The judgment entered in favor of plaintiffs LMP, SLP, and Calmont, and against defendants Universal and its corporate successor, MagneTek, Inc., on plaintiffs' causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud and interference with advantageous business relations, is reversed.

The judgment entered in favor of defendants Universal and its corporate successor, MagneTek, Inc., and against plaintiffs LMP, SLP, Calmont and

---

[12] In attempting to persuade this court that they never waived their claims for breach of the implied covenant of good faith and fair dealing in the licensing agreements and that the trial court in fact validated these claims long before trial, plaintiffs' brief does not accurately represent the trial court's 1987 order denying Universal's motion for summary adjudication. Contrary to plaintiffs' contention, the trial court did not impliedly uphold any causes of action based on the licensing agreements. As the record makes clear, plaintiffs had not asserted any claims under the licensing agreements at that point. To the contrary, they had repeatedly represented to the trial court that they were *not* making any claims under those agreements.

*See footnote, *ante*, page 1412.

Alling, on plaintiffs' causes of action for violation of the Cartwright Act and for wrongful termination of employment, is affirmed.

Costs on appeal are awarded to Universal and its corporate successor, MagneTek, Inc.

White, P. J., and Chin, J., concurred.

A petition for a rehearing was denied May 28, 1992, and the petition of appellants William R. Alling et al., for review by the Supreme Court was denied July 23, 1992.