MECKLENBURG FURNITURE
SHOPS, INC., Plaintiff,

v.

MAI SYSTEMS CORPORATION, f/k/a
MAI Basic Four, Inc., Defendant.

No. C–C–90–147–P.

United States District Court,
W.D. North Carolina,
Charlotte Division.

July 28, 1992.

Bruce M. Simpson, James McElroy & Diehl, Charlotte, N.C., for plaintiff.

Charles A. Edwards, John R. Rittelmeyer, Raleigh, N.C., Elliott J. Stein, Tustin, Cal., for defendant.

## MEMORANDUM OF DECISION

ROBERT D. POTTER, District Judge.

THE TRIAL of this Action was held before this Court and a jury from 4 May 1992 through 7 May 1992 in Charlotte, North Carolina. Plaintiff alleges that Defendant and Plaintiff entered into a contract obligating Defendant to provide Plaintiff a custom computer system capable of performing functions specified by Plaintiff. Complaint of Plaintiff at 2. Plaintiff further alleges that Defendant made misrepresentations to induce Plaintiff to enter this contract and that Defendant ultimately breached the contract. *Id.* at 2, 3. Appearing for Plaintiff at trial was Bruce M. Simpson of

the Charlotte law firm of James, McElroy & Diehl, P.A. Appearing for Defendant at trial were Charles A. Edwards and John R. Rittelmeyer of the Raleigh office of Graham & James.

At the close of Plaintiff's evidence, Defendant moved this Court for Judgment as a Matter of Law. *See* Fed.R.Civ.Pro. 50(a). After careful consideration, this Court granted the Motion of Defendant. Now, pursuant to that Order, the Court enters the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

The Plaintiff, Mecklenburg Furniture Shops, Inc. ("Mecklenburg"), formerly did business in Charlotte, North Carolina as Mecklenburg Furniture Shops. Trial Transcript at 35, 311. Mecklenburg provided a wide variety of retail services to its customers, including interior planning and design, custom upholstery, rugs, accessories, and furniture. Trial Transcript at 35. In November of 1981, the Crewe family, consisting of Leonard Crewe, his wife Betty Crewe, and his son, Clarke Crewe, purchased Mecklenburg. *Id.* The three members of the Crewe family each played an active role in the management of Mecklenburg. *Id.* Leonard Crewe served as Chairman of the company, Betty Crewe as Secretary and Vice–Chairman, and Clark Crewe as President. *Id.* at 35, 90. Betty Crewe, in particular, focused on financial management and inventory control. *Id.* at 91.

In this capacity, Betty Crewe came to realize that Mecklenburg needed to upgrade its computer equipment. *Id.* Accordingly, in 1982, Mecklenburg purchased an IBM computer system. *Id.* Mecklenburg used this system for general accounting and inventory functions. *Id.* at 95. Betty Crewe was "very much involved in selecting" the software for this system and in working with a consultant in "implementing and testing the programs." *Id.* at 92. Betty Crewe had extensive prior experience in selecting and evaluating computer systems. *Id.* Subsequent to the purchase of the IBM system, the Crewes determined that Mecklenburg needed yet another computer system to be used strictly for telemarketing, bulk mail, and pricing. *Id.* at 93–94. To that end, Mecklenburg purchased a Tandy computer sometime in the mid 1980s. *Id.* at 94.

These systems soon proved unsatisfactory. Because the IBM system performed general accounting functions, all telemarketing data from the Tandy system had to be entered into the IBM system as well. *Id.* at 95. Given this and other disadvantages of the older systems, the Crewes decided to purchase another, more powerful computer system. *Id.* The Crewes hoped to decrease the labor required for duplicate data entry and gain faster computers. *Id.* Ultimately, the Crewes hoped to better serve their customers through greater efficiency. *Id.*

To assist Mecklenburg in its search for a new computer system, the Crewe family hired an outside consultant, the accounting firm of Seidman & Seidman BDO ("Seidman"). *Id.* at 96. Initially, the Crewes and the employees of Mecklenburg discussed the computer functions they needed or wanted. *Id.* at 97. Then, after committing this list to writing, Mecklenburg gave it to Claudia Miller, the Seidman employee working with Mecklenburg to secure a new computer system. *Id.* Miller then researched the needs of Mecklenburg and developed her own list. *Id.* This list, styled by Miller a "Request for Proposal," consisted of five sections and set out in detail the requirements of Mecklenburg and the criteria by which Mecklenburg would evaluate proposed computer systems. Plaintiff's Trial Exhibit 1; Trial Transcript at 97–98. On Mecklenburg's behalf, Seidman sent the Request for Proposal ("RFP") to six vendors of computer systems. *Id.* at 246. Of these six, only two submitted proposals. *Id.*

On 14 June 1988, Claudia Miller and Betty Crewe met to discuss the two responses to the RFP. *Id.* at 102–03. Just prior to this meeting, Mecklenburg had received a bill for tax and consulting services provided by Seidman. *Id.* The bill, which totalled approximately $10,000.00, was larger than Mecklenburg had anticipated. *Id.* As

a result, Betty Crewe informed Miller that Mecklenburg could no longer afford the consulting services of Seidman. *Id.* at 102, 251. Without Seidman, Mecklenburg was forced to evaluate the two proposals without significant outside assistance. *Id.* at 251–52.

One of the responding vendors was Defendant, MAI Systems Corporation, then known as MAI Basic Four ("MAI"). Plaintiff's Trial Exhibits 1 and 2; Trial Transcript at 98. In part, MAI responded by making notations on the RFP and returning that document to Seidman. Plaintiff's Trial Exhibit 1; Trial Transcript at 100. Section II of the RFP is entitled "Instructions and Conditions." Plaintiff's Trial Exhibit 1 at § II. Paragraph six of that section provides:

> Vendors are encouraged to submit concise and clear responses to the Request for Proposal. Attention is directed to Section III: Requirements, which provides details on information expected in the vendor responses. Mecklenburg reserves the right to include any part or parts of the selected vendor's proposal in the final contracts.

*Id.* An MAI representative made specific notations in the margin of the RFP at section II, paragraph six. Those notations provided: "Reference MAI Manual. S = Standard, W = Willing to Modify N = Not Willing To Modify." *Id.* These same abbreviations were used in the MAI manual, a separate document attached by MAI to its proposal. Trial Transcript at 235. Betty Crewe understood those notations to mean that RFP requirements marked "S" by MAI were a part of the standard MAI system, that requirements marked "W" by MAI were not a part of the standard MAI system but that MAI was willing to modify its standard system to meet those requirements, and that requirements marked "N" were unavailable from MAI. *Id.* at 100. Betty Crewe and others at Mecklenburg began referring to this marked-up RFP as the "SWN papers." *Id.* at 98.

On 16 June 1988, Betty Crewe met for the first time with Susan Gayda, an MAI sales representative who had previously worked with Claudia Miller of Seidman on the MAI response to the RFP. *Id.* at 103. Also at the meeting were Ed Rand, the Mecklenburg Controller, and Jeff Metheny, another Mecklenburg employee. *Id.* at 105. Those present discussed in detail the needs of Mecklenburg and the proposal submitted by MAI. *Id.* at 104. Particular attention was paid to those Mecklenburg requirements MAI had marked "W" or "N." Requirements marked "S" were not discussed. *Id.* During the course of this discussion, Gayda changed the notation on a few Mecklenburg requirements from "N" to "W." *Id.* at 106. Subsequently, near the end of June 1988, Betty Crewe, Clark Crewe, Leonard Crewe, Ed Rand, Jeff Metheny, and Amy Deaton, the Mecklenburg telemarketing manager, met with MAI representatives including Susan Gayda and Frank Kavanagh. *Id.* at 107. At that meeting, MAI demonstrated its computer system. *Id.* The meeting also involved discussions centered around Mecklenburg's needs for its telemarketing operation. *Id.* The SWN papers returned by MAI were incorporated into these discussions. *Id.* at 108.

After this meeting, there were no further substantive discussions between Mecklenburg and MAI until 15 July 1988. *Id.* at 109. On that date, Betty Crewe met again with Susan Gayda and a representative from Bell Atlantic–TriCon Leasing Corporation ("Bell Atlantic"). *Id.* During this meeting, Betty Crewe, as Secretary of Mecklenburg Furniture Shops, signed a Valid Data Software Contract and a MAI Purchase and License Agreement. *Id.* at 110–11; Plaintiff's Trial Exhibits 12 & 13. Later, on 25 July 1988, Betty Crewe signed a Bell Atlantic Leasing Agreement. *Id.* at 184. These documents reflect the means by which MAI provided a complete computer system to Mecklenburg: MAI Basic Four is a hardware manufacturer, Valid Data is an internal MAI retail furniture software vendor, and Tres Computer Concepts is an independent MAI software vendor for job costing[1]. Plaintiff's Trial Ex-

---

**1.** For ease of reference, the Court will not distinguish between MAI and Valid Data. Thus,

hibit 2; Trial Transcript at 132–133. Further, in what was essentially a method of financing its purchase, Mecklenburg would lease all its MAI computer hardware from Bell Atlantic. Trial Transcript at 111; Plaintiff's Trial Exhibit 15. At the time she signed these contracts, Betty Crewe had before her the contracts, the MAI manual, and the SWN papers. Trial Transcript at 111. The contracts were not sprung upon Betty Crewe that day; she had them in her possession for approximately one month prior to the 15 July meeting. *Id.* at 263. Nevertheless, other than to verify the dollar amounts, Betty Crewe did not read any of these contracts. *Id.* at 183. Nor did she discuss the contracts with Susan Gayda. *Id.* Susan Gayda and Betty Crewe made only one modification to the contracts: the deletion of a software module for credit accounts receivable. *Id.* at 183, 262. Betty Crewe signed the contracts in such haste because she wanted to take advantage of a special discount available only if she signed on or before 15 July 1988. *Id.* at 183. Mecklenburg had no outside attorney or accountant review the MAI contracts prior to the time Betty Crewe signed those documents. *Id.* at 247–52. Betty Crewe believed the contracts she signed provided that she "would receive the hardware and software described in ... the SWN Papers and the book containing the contract from MAI." *Id.* at 112.

The Valid Data Software Contract provided in pertinent part:

3. *Warranties:*

VALID DATA INC. warrants that the Software prepared or designed by VALID under this Agreement shall be error-free. In the event that any error shall arise (i.e., the work product shall not conform to the Systems Definitions), VALID will correct any such error at no cost to LICENSEE.

. . . .

4. *Both VALID and LICENSEE agree as follows:*

. . . .

B. .... No action, regardless of form, arising out of the services under this Agreement, may be brought by either party more than one year after the cause of action has accrued, except that an action for nonpayment may be brought within one year of the date of the last payment.

VALID does not make any express or implied warranties, including, but not limited to, the implied warranties of merchantability and fitness for a particular purpose. In no event will VALID be liable for consequential damages even if VALID has been advised of the possibility of such damages.

. . . .

D. The LICENSEE acknowledges that he has read this Agreement, understands it and agrees to be bound by its terms and further agrees that it is the complete and exclusive statement of the Agreement between the parties, which supersedes all proposals oral or written and all other communications between the parties relating to the subject matter of this Agreement.

Plaintiff's Trial Exhibit 12. In the same manner, the MAI Purchase and License Agreement provided:

6(c) *DISCLAIMER OF WARRANTY.* THE FOREGOING LIMITED WARRANTY FOR EQUIPMENT AND SUPPORT FOR SOFTWARE PROVISIONS ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

Plaintiff's Trial Exhibit 13. Further, that agreement contained a paragraph limiting the agreement of the parties to the written terms of that document. *Id.* at par. 11.

Susan Gayda did not sign either the MAI or Valid Data contract during the 15 July 1988 meeting. *Id.* at 110. Gayda explained to Betty Crewe that appropriate MAI representatives would sign the contracts and then return them to Mecklenburg within one week. *Id.* Betty Crewe

the Court will refer to Valid Data software as "MAI software."

did not retain copies of the unexecuted contracts. *Id.*

In a short while, in August of 1988, the MAI hardware arrived at Mecklenburg and installation of that hardware began immediately. *Id.* at 117. In September of that same year, portions of the MAI software arrived. *Id.* at 131. Installation of that software also began immediately. *Id.* In addition, also in August of 1988, Betty Crewe received from MAI a signed hardware contract and a blank software contract. *Id.* at 118, 188; Plaintiff's Trial Exhibit 25. For reasons never made clear, this software contract replaced the software contract signed by Betty Crewe on 15 July 1988. Trial Transcript at 188. There are no substantive differences between the two contracts; the latter contract reflects the name change of Valid Data to MAI. Plaintiff's Trial Exhibits 12 & 25. On 20 October 1988, Betty Crewe signed the replacement contract. *Id.;* Plaintiff's Trial Exhibit 25. She did so because she believed MAI would stop the ongoing installation if she did not. Trial Transcript at 188. In pertinent part, in a manner similar to the contract it replaced, the replacement software contract provided:

14. INTERPRETATION:
References in this Agreement to MBF shall include its parent and its subsidiaries, divisions, and affiliates, and their respective predecessors—and successors-in-interest. The captioned headings in this Agreement are for convenience of reference only and are not to be considered in interpreting this Agreement. This Agreement supersedes all prior and contemporaneous communications and agreements between the parties relating to the subject matter of this Agreement and constitutes the full understanding between the parties with respect thereto. No waiver of any provision of this Agreement or of any breach and no modification or supplement hereto shall be binding unless in writing and signed by an authorized representative of the party against whom the waiver is sought to be enforced.... No practice or custom of dealing between the parties hereto or others shall be used to modify, interpret, or supplement this Agreement. The terms and conditions set forth herein shall prevail notwithstanding the terms and conditions of any order or communication previously or hereafter submitted by a party. This Agreement shall be governed by the laws of the State of California.

Plaintiff's Trial Exhibit 25.

Mecklenburg believed it important to shift as quickly as possible all of the computer functions performed by the IBM system and the Tandy system to the MAI system. *Id.* at 113, 131–38. Doing so would allow Mecklenburg employees to cease the duplicate data entry required by the IBM and Tandy systems. *Id.* Accordingly, Mecklenburg hired temporary personnel to enter data as the MAI installation progressed. *Id.* As Mecklenburg employees began to use the MAI system, they began to experience difficulties in the operation of that system. *Id.* at 119.

On 5 December 1988, Betty Crewe sent a letter to Frank Kavanagh of Valid Data, outlining perceived deficiencies in the MAI software. Plaintiff's Trial Exhibit 32; Trial Transcript at 139–40. In part, that letter provides: "Unfortunately, we have found that many of the responses to our Request for Proposal were marked 'S' or Standard when they apparently are not Standard." Plaintiff's Trial Exhibit 32 at 2. Kavanagh responded that same day by letter to Betty Crewe. Plaintiff's Trial Exhibit 33. Kavanagh's letter set out a schedule for completion of several projects meant to eliminate the problems Mecklenburg employees were experiencing with the MAI software. *Id.* Kavanagh did not address MAI's response to the Mecklenburg RFP. *Id.*

As a result of this letter exchange, Carey Herdman, a MAI regional manager, met with various Mecklenburg representatives, including Betty Crewe and Richard Bullard of Seidman, on 20 December 1988. Trial Transcript at 141, 296. Herdman reviewed the SWN papers and indicated that MAI would honor its representations made in that document: "If we promised it, then we will have to deliver it." *Id.* Despite Herdman's assurances, Bullard advised Betty

Crewe that the contracts between Mecklenburg and MAI should have expressly referenced the RFP. *Id.* at 296–97. Betty Crewe acknowledged that she made a mistake in not retaining Seidman for assistance in the selection of a computer system and the negotiations leading to its purchase. *Id.*

By March of 1989, Mecklenburg employees were still experiencing difficulties with the MAI software. *Id.* at 139. As a result, "the frustration point was very high and the dissatisfaction was growing daily because no progress was being made and that was the time that ... we involved Weinstein and Sturges in trying to get the problems resolved." *Id.* (testimony of Betty Crewe). On 20 March 1989, Attorney E. Fitzgerald Parnell, III, of Weinstein & Sturges, P.A., a Charlotte, North Carolina law firm, sent to Carey Herdman a detailed letter outlining the problems Mecklenburg continued to experience with the MAI system. Plaintiff's Trial Exhibit 52; Trial Transcript at 141–42. In form, this letter followed the RFP and noted specific instances where the MAI system failed to perform according to notations MAI made to that document. *Id.* The letter further notified MAI that Mecklenburg demanded resolution of the listed problems within thirty days. Plaintiff's Trial Exhibit 52.

On 31 March 1989, Kavanagh sent to Weinstein & Sturges a letter containing a point by point response to Parnell's letter of 20 March 1989. Plaintiff's Trial Exhibit 57. In addition, on 3 April 1989, Kavanagh met with Betty Crewe and other Mecklenburg representatives. *Id.;* Trial Transcript at 144. Substantial activity followed this letter and meeting, including a letter to Kavanagh from Betty Crewe, dated 12 April 1989, informing him that Mecklenburg would extend the thirty day period by ten days to 30 April 1989. Plaintiff's Trial Exhibit 61. Further, on 5 May 1989, Clarke Crewe mistakenly sent an unsigned letter to Kavanagh informing MAI that Mecklenburg thereby rejected the MAI system. Plaintiff's Trial Exhibit 68. Clarke Crewe later retracted this letter. Plaintiff's Trial Exhibit 70. Throughout this period, MAI continued efforts to resolve Mecklenburg's problems. Trial Transcript at 147.

On 8 June 1989, Betty Crewe met with Robert Garbutt, a MAI Senior Vice President, at a National Users Group Conference. *Id.* at 147, 306. Subsequently, on 15 June 1989, following a telephone conversation with Garbutt the previous day, Betty Crewe sent Garbutt a letter detailing her understanding of that conversation. Trial Transcript at 306; Plaintiff's Trial Exhibit 81. In part, Betty Crewe's letter provided: "You confirmed Carey Herdman's commitment for MAI to deliver all the items promised in the negotiations of this purchase as outlined in our RFP." Plaintiff's Trial Exhibit 81. On 22 June 1989, Garbutt responded by letter to Betty Crewe. Plaintiff's Trial Exhibit 82. In that letter, Garbutt expressly rejected Betty Crewe's reconstruction of their earlier conversation. *Id.* In pertinent part, his letter further provided:

[Y]our letter seems to reflect a basic misunderstanding of the agreements between [MAI] and Mecklenburg and of what commitments have been made by which party.... Based on careful review of "the Agreements" (the Application Software agreement, the "Software Agreement" signed by you on October 20, 1988 and the Purchase and License Agreement, "the Hardware Agreement" signed by you on July 15, 1988) let me state our position with regard to [MAI's] further activities.

1. The Agreements represent the full understanding between [MAI] and [Mecklenburg]. The RFP is not binding and it is not referenced by nor in any way tied to any of the Agreements between [MAI] and Mecklenburg. We both agreed to this when the Agreements were executed. (See paragraph 14 of the Software Agreement and paragraph 11 of the Hardware agreement.) Any past references to the RFP were made in an effort to understand Mecklenburg's implementation of the system not as a document listing our commitments to you.

. . . .

June 15th letter to me:

1. This is not an accurate summary of our discussion. My commitment to you was to deliver anything we agreed to and that further review of our agreements was necessary to determine our full obligations to Mecklenburg.

2. Carey Herdman's commitment is the same as # 1.

. . . .

While it has been and will continue to be [MAI's] desire to provide Mecklenburg with a satisfactory solution to their information processing requirements, the demands you have made go above and beyond what is included in our Agreements. As a matter of prudent business practice, we must hold to the Agreements made and address further requirements in a like manner.

*Id.* Betty Crewe never responded to this letter. Trial Transcript at 308–09. However, she did send Garbutt a series of letters describing in detail a variety of problems with the MAI software. *Id.;* Plaintiff's Trial Exhibits 83, 84, 87, 88. On 30 June 1989, Garbutt by letter informed Betty Crewe that she should direct future correspondence to Carey Herdman. Plaintiff's Trial Exhibit 85. Betty Crewe then sent a series of letters to Carey Herdman. Plaintiff's Trial Exhibits 89, 90, 91, 92. Each of these letters described a particular problem with the MAI software. *Id.*

In response to the letters mailed to Herdman and Garbutt, Herdman, by letter dated 7 August 1989, informed Betty Crewe that "[a]fter reviewing the various documents that you have sent us, we are finally in a position to respond with a plan. Although we do not recognize any contractual obligation to do so, we are now prepared to undertake some projects which will fulfill some of your requests." Plaintiff's Trial Exhibit 93. Herdman's letter outlined MAI's proposed responses to the complaints voiced by Betty Crewe. *Id.* While Herdman noted that some of the proposed projects would not entail additional cost, he also noted that other proposed projects would involve additional charges: "[b]ased upon your agreement with this memorandum, we can devise prices and a schedule to implement your requests." *Id.* at 2.

Betty Crewe responded to Herdman by letter dated 18 August 1989. Plaintiff's Trial Exhibit 94. In her letter, Betty Crewe reiterated her belief that "MAI does have a legal contractual obligation to deliver the features described in its response to questions concerning the functions and features of the programs Mecklenburg was obtaining when signing the related agreements." *Id.;* Trial Transcript at 309–10. Betty Crewe also indicated that Mecklenburg did not believe additional MAI charges were warranted. Trial Transcript at 309–10. In November of 1989, Frank Kavanagh sent Betty Crewe a final letter outlining MAI's position regarding further work. Trial Transcript at 162. There were no further substantive communications between Mecklenburg and MAI. *Id.* By this time, the Crewes had decided to pursue legal action against MAI. *Id.* In December of 1990, the Crewe family sold Mecklenburg to K–Town Furniture. *Id.* at 76. On 7 May 1990, Mecklenburg brought this suit against MAI. *Id.* at 303.

## CONCLUSIONS OF LAW

As a starting point, the Court notes that the final software contract signed by the Parties provides that "[t]his Agreement shall be governed by the laws of the State of California." Plaintiff's Trial Exhibit 25. However, the Parties have, in their pre-trial briefs, relied on North Carolina, New York, and California law. This Court has previously noted that in many respects the pertinent law of North Carolina, New York, and California is identical. Order of the Court at 7 n. 1 (Dec. 12, 1990). Nonetheless, because the Court believes the Parties' own agreements evidence an intent to be bound by the law of California, this Court will interpret the evidence before it pursuant to the law of that State.

 Above all else, contract interpretation calls upon a court to ascertain the intent of the parties. *Appalachian Ins. Co. v. McDonnell Douglas Corp.,* 214 Cal. App.3d 1, 11, 262 Cal.Rptr. 716, 720 (Cal. App. 4 Dist.1989) (citations omitted). The beginning point of contract interpretation

is the language of the contract. That language—if it is clear—must control the interpretation. *Id.* If the language is unclear, the court may consider extrinsic evidence regarding the meaning of the contract. *Id.* However, "the parol evidence rule generally prohibits the introduction of any extrinsic evidence, whether oral or written, to vary, alter or add to the terms of an integrated written instrument." *Alling v. Universal Mfg. Corp.*, 5 Cal.App.4th 1412, 7 Cal.Rptr.2d 718, 731 (Cal.App. 1 Dist.1992). The parol evidence rule is not merely a rule of evidence, but is a substantive rule of law. *Banco Do Brasil, S.A. v. Latian, Inc.*, 234 Cal.App.3d 973, 1000, 285 Cal.Rptr. 870, 885 (Cal.App. 2 Dist.1991). It operates to make the "integrated written agreement of the parties their exclusive and binding contract *no matter how persuasive the evidence* of additional oral understandings." *Marani v. Jackson*, 183 Cal.App.3d 695, 701, 228 Cal.Rptr. 518, 521 (Cal.App. 1 Dist.1986) (emphasis in original). A contract is integrated if it is a writing or writings constituting the final expression of the parties as to one or more terms of an agreement. *Alling*, 5 Cal.App. 4th at 1432–33, 7 Cal.Rptr.2d at 731 (citing Rest.2d Contracts, § 209 subd. (1)). Whether or not a contract is integrated is a matter of law for the court to decide. *Id.* 5 Cal.App.4th at 1434–35, 7 Cal.Rptr.2d at 732 (citations omitted).

In making this determination, the crucial issue is whether or not " 'the parties intended their writings to serve as the exclusive embodiment of their agreement.' " *Marani*, 183 Cal.App.3d at 702, 228 Cal.Rptr. at 521 (quoting *Salyer Grain & Milling Co. v. Henson*, 13 Cal.App.3d 493, 498, 91 Cal.Rptr. 847, 851 (1970)); *Banco Do Brasil*, 234 Cal.App.3d at 1001–02, 285 Cal.Rptr. at 886. The natural starting point for such a determination is the instrument itself: where the instrument contains an integration clause, that clause may well be conclusive on the issue of integration. *Banco Do Brasil*, 234 Cal. App.3d at 1001–02, 285 Cal.Rptr. at 886. Nonetheless, the court must not limit its consideration to the integration clause. Rather, the court should consider all the surrounding circumstances, including the prior negotiations of the parties, and the terms of the collateral agreement. *Id.* Even so, the collateral agreement will be considered only to the extent it does not contradict the written contract of the parties. *Id.* Further, "[i]n the case of prior or contemporaneous representations, the collateral agreement must be one which might naturally be made as a separate contract, i.e., if in fact agreed upon need not certainly have appeared in writing." *Id.* (quoting *Wagner v. Glendale Adventist Medical Center*, 216 Cal.App.3d 1379, 265 Cal.Rptr. 412 (1989)). These same principles are codified in the California Code of Civil Procedure at section 1856 and in section 2202 of the California Commercial Code. *Continental Airlines v. McDonnell Douglas*, 216 Cal.App.3d 388, 418, 264 Cal.Rptr. 779, 795 (Cal.App. 2 Dist.1989). In pertinent part, section 1856 provides:

(a) Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement.

(b) The terms set forth in a writing described in subdivision (a) may be explained or supplemented by evidence of consistent additional terms unless the writing is intended also as a complete and exclusive statement of the terms of the agreement.

Code Civ.Proc. § 1856. Thus, under both common and statutory law, extrinsic evidence may not be used to contradict an integrated contract nor explain or supplement a document representing the complete and exclusive agreement of the parties.

The contracts signed by Betty Crewe contain specific provisions detailing what MAI will provide Mecklenburg pursuant to those contracts. *See e.g.*, Plaintiff's Trial Exhibit 25, Rider 2. Because those contracts are integrated and declare that they are the complete, full, or exclusive agreement of the Parties, Mecklenburg may not contradict, explain or supplement

those contracts with the SWN papers. *Alling*, 5 Cal.App.4th at 1434–35, 7 Cal. Rptr.2d at 732; Civil Code Proc. § 1856(b).

Here, Betty Crewe, on behalf of Mecklenburg, signed three contracts central to this case: the Valid Data Software Contract, the MAI Purchase and License Agreement, and the replacement MAI Applications Software Agreement. Each of those contracts contains an integration clause expressly providing that the signed documents represent the full and final agreement of the parties. Nevertheless, Mecklenburg insists that the SWN papers were a part of the contract. Indeed, Mecklenburg's position is more than this. It is an assertion that the SWN papers constitute the contract entered into by Mecklenburg and MAI.

As such, Mecklenburg's position is not only inconsistent with the contracts signed by Betty Crewe, but it is also inconsistent with the very document upon which it relies. The RFP expressly provided that "Mecklenburg reserves the right to include any part or parts of the selected vendor's proposal in the final contracts." Plaintiff's Trial Exhibit 1. Having failed to expressly include the SWN papers in its contracts, Mecklenburg now asks the Court to do so. This Court is unwilling, under the guise of contract interpretation, to ameliorate the effects of Mecklenburg's failure to follow prudent business practices. Betty Crewe testified that even though she had ample time to do so, she did not read either the Valid Data Software Contract or the MAI Purchase and License Agreement. Trial Transcript at 183. She further testified that she signed the contracts in haste to take advantage of a price discount. *Id.* Given her admitted extensive experience in business, particularly in the evaluation and selection of computers, there is no basis upon which Betty Crewe can now assert that she meant to do anything other than what she in fact did: sign a series of contracts which expressly provided that those documents were the complete and final agreement of the Parties.

In pertinent part, Rule 50 of the Federal Rules of Civil Procedure provides:

(a) Judgment as a Matter of Law.

If during a trial by jury a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against that party on that claim....

Fed.R.Civ.P. 50(a). Judgment as a Matter of Law is proper only where "the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict." *Brady v. Southern Railroad*, 320 U.S. 476, 479–80, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943). *Brady* does not require that there be a complete absence of proof supporting the claim of the party opposing the motion for Judgment as a Matter of Law. Rather, it is enough that the evidence and the corresponding inferences so strongly favor the moving party that reasonable jurors could not conclude otherwise. J. Moore et al., Moore's Federal Practice par. 50.02[1] (2d ed. 1992).

Here, Mecklenburg's own evidence demonstrated that Betty Crewe, on Mecklenburg's behalf, signed contracts which excluded the SWN papers from the agreement of the Parties. Mecklenburg's complaint asserted claims not for breach of the contracts signed, but for breach of the SWN papers. Once it became clear that the SWN papers were not a part of the contract, there was no basis upon which Mecklenburg could recover. As such, Judgment as a Matter of Law was properly granted for MAI.

## CONCLUSION

Plaintiff failed to put on evidence sufficient to support its claims for breach of contract. Accordingly, Judgment as a Matter of Law was properly granted Defendant on that claim. As such, there is no need for the Court to consider Plaintiff's unfair and deceptive business practice claims. Further, because MAI put on no

evidence, the Court will today dismiss its counterclaim.